**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00386-CR
NO. 09-19-00387-CR
_____

**ZEESHAN MAQBOOL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 258th District Court
San Jacinto County, Texas
Trial Cause Nos. CR12,525, CR12,526**

**MEMORANDUM OPINION**

This appeal arises from a consolidated punishment hearing that occurred after Zeeshan Maqbool pleaded guilty to the allegations in two indictments, one charging him with the murder of Christopher Lee Miles, the other with committing an aggravated assault against *Mary*, a person who was at that time his wife. In the punishment hearing, Maqbool presented evidence and argued he was overcome by sudden passion when he murdered Miles. The sudden-passion defense lowers the punishment available for the murder if successful and the defendant is convicted

1

from a first-degree felony to a felony of the second degree.[1] Maqbool elected to have the trial court decide his punishment. In the end, the trial court assessed thirty-year sentences in each of the cases. It also explained why the court rejected Maqbool's claim of sudden passion when the hearing ended.

Maqbool appealed. In one of his issues, he complains about the trial court's failure to find in his favor on his sudden passion defense. In his other issue, which applies to both of his convictions, he complains the trial court erred by admitting five photographs of Mary that show her in a hospital bed following the assault. Generally speaking, the photos show the nature and extent of the injuries Mary suffered when Maqbool struck her with a bat.

We conclude Maqbool's issues lack merit, so we will affirm.

Background

In April 2018, Maqbool assaulted his wife, Mary, after finding Mary and her boyfriend together in bed. Maqbool and Mary had separated a few days before the incident occurred. Mary insisted that Maqbool leave the home after they argued about the fact she was spending time and sending messages to Miles on her phone. The night that Miles died, Maqbool returned to Mary's home after he learned that Mary and Miles had gone out with each other that evening. Upon entering Mary's bedroom, he found Miles in bed with Mary. An altercation occurred and Maqbool

---

[1]Tex. Penal Code Ann. § 19.02(d) (Sudden Passion Defense).

2

killed Miles by stabbing him with a knife and then striking him with a baseball bat.[2] After finishing with Miles, Maqbool struck Mary in the head with a baseball bat. Believing that he had killed Mary and Miles, Maqbool left and called the police to report what he had done.

Just over a month later, a San Jacinto County Grand Jury indicted Maqbool for committing an aggravated assault (with a deadly weapon) against Mary and for murdering Miles. In return for a plea agreement to cap his sentence in the cases to forty-year sentences, Maqbool pleaded guilty. As charged in the indictments, the crimes alleged in the indictments are both first-degree felonies, which are punishable with a sentence of not less than five or more than 99 years (or life).[3] After Maqbool pleaded guilty, he told the trial court he wanted to reserve his "right to argue sudden passion in the murder case" at punishment. The prosecutor stated the State did not object to going forward with that understanding. The trial court acknowledged the agreement and said the cases would proceed to punishment on that basis.

The trial court conducted the consolidated punishment hearing in Maqbool's cases two months after accepting Maqbool's plea. During the hearing, Maqbool

---

[2]*Id.* § 19.02(b)(1). While Miles is the victim named in the indictment for murder, the Court of Criminal Appeals does not typically use initials or another alias to avoid identifying the name of someone who was killed. *See, e.g.*, *Macedo v. State*, 620 S.W.3d 237, 238 (Tex. Crim. App. 2021). For that reason, we do not disguise Miles's name.

[3]Tex. Penal Code Ann. §§ 12.32, 19.02(c), 22.02(b)(1).

objected when the prosecutor offered five photographs into evidence showing Mary in a hospital bed and the injuries she suffered during the assault. Maqbool asked the trial court to exclude the photos from evidence, arguing they were more prejudicial than probative to the issues involved in his punishment hearing given the "graphic nature" of the injuries in the photos. The trial court overruled the objection.

The remaining discussion about the background information relevant to Maqbool's issues focuses on the evidence related to Maqbool's sudden passion defense. The State's case-in-chief was presented through nine witnesses, four of them police officers involved in the investigation of Mileses' death. Mary did not testify in the hearing. The evidence before the trial court includes many exhibits, including a videorecording that police obtained from Maqbool when he gave police a statement explaining what happened at Mary's house the night Mileses' death occurred. Maqbool's recorded interview with the police is approximately six-hours long. The interview occurred the same day the crimes occurred. Generally, the videorecording shows Maqbool and Mary separated a few days before Maqbool discovered Mary and Miles together in bed. The recording shows that Maqbool knew Mary wanted a divorce and that Mary and Miles had gone out together drinking before he decided to go to Mary's house.

Detective Gary Sharpen, an employee of the San Jacinto County Sheriff's Office, conducted the recorded interview Maqbool gave the police. During the

4

interview, Maqbool told the detective that he and Mary married in October 2016, but then separated in late January 2017 shortly after Maqbool learned that Mary was cheating on their marriage.

During the interview, Maqbool told the detective he moved back in with Mary in February 2017 to help her recuperate after Mary was released from a hospital, where she was treated for ongoing problems she had with her heart. After they moved back in together, their arguments about their relationship persisted. In large part, according to Maqbool, the arguments concerned Mary's decisions that led her to cheat on the marriage. For example, Maqbool told the detective he came home one day and saw Mary and a man named Eric having sex on the couch. According to Maqbool, he left without saying anything. Later that day, Mary called Maqbool and told him that Eric was "just a friend[.]" Even so, several days later, Maqbool found two voicemail messages that Mary sent to Eric on her phone. One of the messages described a sexual act. The other, according to Maqbool, mentions that Mary told Eric she was developing feelings for him. Maqbool told the detective that upon discovering the voicemails, he felt angry and betrayed.

The indictments allege the assault and murder occurred on Thursday, April 12, 2018. Maqbool told the detective that before April 12, Mary learned that Maqbool was monitoring the messenger service she was using to send messages to others from her phone. Mary reacted angrily when she found out that Maqbool was

5

monitoring her messages. Maqbool also told the detective he was tracking Mary's location from his phone by using a location service that he had enabled on Mary's phone. Maqbool told the detective that by using the location service, and while out of town on business, he learned several days before he killed Miles that Mary was at Mileses' home. Maqbool drove home and went to Mileses' house. He found Mary and Miles together there after midnight. After he woke everyone up, Maqbool told Mary to come home. Mary did so. However, the couple continued arguing about Mary's relationship with Miles and the fact that Maqbool was monitoring where she was and whom she was sending messages to through the internet. Ultimately, Mary demanded Maqbool leave, and threated him with a divorce. Mary told Maqbool she would call the police if he refused to leave.

On April 10, 2018, Maqbool left the house. The next day, Wednesday April 11, Mary sent Maqbool a text message accompanied by a photograph of her with Miles. The image, according to Maqbool, shows Mary and Miles together in Mileses' bedroom. Maqbool explained that he knew the photo Mary sent him was taken on April 10, the day that he found Mary with Miles at Mileses' home by the clothing Mary was wearing in the photo.

After separating on April 11, Maqbool and Mary continued exchanging text messages. Mary told Maqbool that she no longer wanted to be with him and wanted a divorce. Maqbool told the detective he responded (by text) to Mary and told her

6

she could not divorce him; he'd treated her like a queen. Maqbool explained that around 7:30 or so on the evening of April 11th, he knew their relationship was over. He acknowledged that at that point, he was upset. That night, Mary sent Maqbool a text message stating she was with her new boyfriend and his friends having fun. He said he knew when Mary made statements like that, she was "drinking and [] fooling around[.]" Maqbool stated the text messages made him "very angry[,]" but he tried to go to sleep.

Around 11:00 p.m. that evening, Maqbool decided to go to Mary's and talk with her to "settle things before something really [did] happen to our relationship." Maqbool did so, he said, because he felt guilty for surreptitiously monitoring Mary's phone. According to Maqbool, he wanted to apologize to Mary because he believed that these activities was the triggering event that caused their last argument, an argument that ended with Mary's demand that Maqbool leave the house and her demand for a divorce.

When Maqbool arrived, he noticed that Mary's SUV was outside. He also noticed a light in the hallway was on. He walked in the front door, which he said was unlocked. Maqbool approached the master bedroom, but the door was closed. Maqbool heard Mary talking before opening the door, but he entered the room without knocking after being unable to make out what was being said. When he opened the door, Maqbool saw Mary and Miles in bed.

7

Mary and Miles laughed at Maqbool when he burst into the room. Mary began shouting. Miles got out of the bed. Maqbool ran to the kitchen and returned with a knife. Maqbool told the detective that at that point, his memory was not clear about what happened in the room. He recalled hitting Miles "with something" as the two men fought. Maqbool denied he knew the object he hit Miles with was a knife. When Miles went down, Mary told Maqbool she was going to call the police. Maqbool said that at that point, something exploded in his head. And by then, he recalled having a baseball bat in his hands, but he denied any memory of striking Mary with the bat. He recalled that when Mary's son walked in, he left the house, got into his truck, and left.

The other testimony offered in punishment provides little more than additional context to explain why Maqbool killed Miles and hit Mary with a bat. The contextual evidence shows that Maqbool is a citizen of and raised in Pakistan. Other evidence in the trial tied the baseball bat and knife found at Mary's home to the murder and the aggravated assault.

In final argument, Maqbool's attorney argued that when Maqbool killed Miles, Maqbool was in a "glaze of sudden passion" after entering the house. The attorney pointed out that the jury heard evidence in the trial that Maqbool entered the house and bedroom unarmed. Maqbool went there, according to the attorney, solely to find out whether Maqbool and Mary could work things out. Upon entering

8

the bedroom, however, Maqbool snapped when he saw Mary in bed with another man. What Maqbool saw, the attorney concluded, was an "act of betrayal that prompted . . . [a] sudden passion response."

Of course, the prosecutor drew different inferences from the evidence before the jury in Maqbool's trial. The prosecutor suggested the evidence did not support an affirmative finding on sudden passion, noting that Mary and Maqbool had experienced multiple instances of infidelity in what the prosecutor characterized as a relatively short marriage, seven months old when the crimes occurred. The prosecutor emphasized that Maqbool knew before he went to Mary's that Mary and Miles had gone out together that evening. Maqbool knew Mary and Miles were drinking and argued he went there expecting to find the two of them together in bed. The evidence shows, the prosecutor continued, that Maqbool was planning to harm Miles and Mary should he find both at Mary's house.

After the parties completed their arguments, the trial court advised the punishment evidence was sufficient to raise an issue on some of the elements of a sudden-passion defense. Even so, the trial court continued, the court was unpersuaded that the passion Maqbool experienced was sudden or the result of an adequate cause based on the evidence in the trial. After explaining the reasons for its ruling, the trial court found: "I'm not going to find the sudden passion." After

9

announcing its ruling, the trial court pronounced Maqbool's sentences and sentenced Maqbool to two, thirty-year concurrent sentences.

Analysis

*Sudden-Passion Defense*

We will first address Maqbool's complaint about the trial court's failure to find in his favor on his claim of sudden passion before we address his other issue complaining about the trial court's ruling admitting the photos of his wife.

A person commits murder if he (1) "intentionally or knowingly causes the death[,]" or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes" the death.[4] Normally, convictions for murder are punishable as first-degree felonies.[5] But if the factfinder returns a verdict in the defendant's favor on his claim of sudden passion, the favorable finding reduces the punishment on the conviction for murder from a felony of the first degree to a second-degree felony.[6]

Under Texas law, the defendant must "prove the issue [on whether he acted under a sudden passion] by a preponderance of the evidence."[7] To prevail on the defense at trial, the defendant must obtain an affirmative finding that "he caused the

[4]*Id.* § 19.02(b).
[5]*Id.* § 19.02(c).
[6]*Id.* § 19.02(d).
[7]*Id.*

10

death under the immediate influence of *sudden passion* arising from an *adequate cause*."[8] The term *adequate cause* carries a statutory definition and means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."[9] The term *sudden passion* is also statutorily defined and means a "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation."[10]

In this case, the record shows that Maqbool failed to secure a favorable finding on his sudden-passion defense. When the defendant challenges a factfinder's failure to find in his favor on an issue on which he had the burden of proof in the trial, the negative finding relevant to the issue is reviewed in the defendant's appeal by focusing on the evidence that favors the negative finding and disregarding the evidence contradictory to the finding unless it is evidence that a reasonable factfinder could not disregard.[11] To prevail in a case involving a challenge to a negative finding on which the defendant had the burden of proof, the defendant must demonstrate

---

[8]*Id.*
[9]*Id.* § 19.02(a)(1).
[10]*Id.* § 19.02(a)(2).
[11]*Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

that the evidence "relevant to the affirmative defense was conclusive and no reasonable factfinder, from that evidence, could have found otherwise."[12]

While evidence in some cases may be legally sufficient to support a negative finding, it remains possible that the evidence, while legally sufficient, is nonetheless factually insufficient to support the negative finding.[13] To resolve a factual insufficiency argument complaining about a factfinder's negative finding on a defense, we view "the entirety of the evidence in a neutral light, rather than the light most favorable to the verdict."[14] Even so, when conducting a factual sufficiency review, we are to avoid usurping the trial court's function as the factfinder so that we may avoid merely substituting our judgment for the judgment the factfinder made in the trial, particularly when its ruling rejecting the defensive issue turned on the credibility of the witnesses that testified.[15] Still, we may sustain a factual sufficiency challenge on appeal if, "after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] state[] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased."[16]

---

[12]*Id.*
[13]*Petetan v. State*, 622 S.W.3d 321, 357 (Tex. Crim. App. 2021).
[14]*Id.*
[15]*Id.*
[16]*Id.*

The description Maqbool gave police hours after killing Miles allowed the trial court, acting as a rational factfinder, to find that Maqbool failed to carry his burden to prove that his passion arose from an *adequate cause*. When viewed in a neutral light, the evidence shows that Mary and Maqbool had a rocky marriage from early on. Their marital problems continued after they reconciled following a separation that occurred only two months into the marriage when Maqbool learned that Mary was still cheating on the marriage with other men. And a few days before April 12, 2018, Mary told Maqbool after they argued over matters that relate to her failure to fulfill the vows of her marriage to clear out. The couple's problems—from Maqbool's account—were largely Mary's fault. But that was a longstanding problem even by Maqbool's own account since Miles was the third person Mary had sexual relationships with after she married Maqbool.

And even when viewing the evidence in a neutral light, the trial court was not required to infer that Maqbool was surprised when he walked in the master bedroom and found Mary in bed with Miles. He knew of the relationship between the two days before he killed Miles. Mary taunted Maqbool by sending him pictures of the two of them together the night she kicked him out of the house. Maqbool knew from what Mary told him in text messages that night that she and Miles were drinking, and he had acknowledged he knew that when Mary was drinking, she liked to go be with other men.

Angry that their relationship was over and blaming Mary for the couple's problems, Maqbool decided to go to Mary's home and confront her. While Maqbool told police he went there just so the two of them could talk, as the factfinder, the trial court was not required to believe that Maqbool was telling the truth about why he chose to go to Mary's that night. Instead, the trial court could have reasonably inferred that Maqbool went there expecting to find Mary and Miles together in bed. Given the history of the couple's marriage, the trial court had the discretion to conclude that Maqbool's decision to kill Miles did not result from a situation that would "commonly produce a degree of anger, rage, resentment or terror" it produced in Maqbool that night had Maqbool been "a person of ordinary temper capable of cool reflection" when the murder occurred.[17]

We hold evidence in the trial is legally and factually sufficient to support the trial court's finding rejecting Maqbool's defense of sudden passion. Maqbool's arguments to the contrary are overruled.

## Photos of Mary's Injuries

Maqbool's remaining issues, the second issue that is common to both appeals, argues the trial court abused its discretion by admitting over his objection the five photos of Mary taken after the assault. We address the issues together because

---

[17]*Id.*

14

Maqbool's arguments about why the photos were not admissible are identical in his appeals.

At trial, Maqbool argued the photos were more prejudicial than probative to the issues to be decided at punishment. He makes the same argument in the briefs he filed to support his appeals. According to Maqbool, the photos are unduly prejudicial because the State offered them to "inflame" the . . . "gross out factor." Maqbool contends the photos of Mary's injuries were not very probative because Mary's "injures are not a contested issue" in the trial. Maqbool made the same argument during his trial. In response, the trial court said: "I have defended and prosecuted capital murder cases and probably close to 20 other murder cases. So I'm pretty use[d] to being grossed out by autopsies and photographs of violent, crime scenes. So I don't think it's going to have an effect on me one way or the other."

On appeal, Maqbool concedes, as he must, that the photos have relevance to issues decided in punishment since the extent of the victim's injuries in an assault case are relevant to a factfinder in deciding what the appropriate length should be for the defendant's sentence. Even so, Maqbool argues the trial court should have excluded the photos because their prejudicial value outweighs their relevance.

On appeal, rulings admitting or excluding evidence are reviewed for abuse of discretion.[18] Under the abuse-of-discretion standard, the reviewing court must

---

[18]*Ramos v. State,* 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008).

uphold the trial court's ruling if the ruling is reasonably supported by the record and is correct under any theory of law that applies to the trial.[19] When addressing arguments complaining a court abused its discretion in conducting the balancing test required by Rule 403, "that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence."[20] "As long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion[.]"[21] To decide whether photos that a trial court admitted were unfairly prejudicial, we consider the number of photos, their size, whether they are in color or in black and white, whether they are "gruesome," whether the victim shown in the photos is naked, the availability of other means of proof, and any other circumstances unique to the case.[22]

The circumstances of the offense, including the extent of the victim's injuries, are relevant to the normative decision that a factfinder must make in deciding what punishment fits the crime.[23] The injuries depicted in the photos at issue here were not taken at angles to make the injuries appear more dramatic or worse than they were.[24] The photos show the nature of Mary's injuries since they show the injuries

---

[19]*Id.* at 418.
[20]*De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).
[21]*Id.* (cleaned up).
[22]*Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010).
[23]*See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1); *Miller-El v. State*, 782 S.W.2d 892, 896 (Tex. Crim. App. 1990).
[24]*Id.*

resulting from being hit in the head with a bat caused bruises to the area around Mary's eyes. Both of Mary's eyelids are bruised and her eyes appear to be swollen shut. The photos show that Mary suffered several cuts on her head, one that was large and required stiches and staples to close. As seen in some of the photos, that wound starts at the top and near the crown of Mary's head. From there, it runs from at a slight angle toward the right side of Mary's forehead. That same wound is the wound that was closed with stitches and staples before the pictures were taken. The wound stops at Mary's hairline, just before it enters her forehead. While the photos are in color and not black and white, the detective in charge of investigating the crimes testified he was present when the photos were taken and that they accurately depict Mary's condition the day he saw her in the hospital after the assault. While the photos show Mary lying in a hospital bed, she appears to be clothed in a gown. The bottom half of Mary's body is covered by a sheet, so the photos basically show parts of her arms, hands, and head. The photos are not identical, and there are only five of them, each taken at a different angle. As a group, they capture the injuries Mary suffered as a result of the assault.

Given the injuries shown in the photos, we agree with the trial court that they are unlikely to have impressed a factfinder in any irrational or indelible way. The State needed the photos to efficiently demonstrate the nature and extent of Mary's injuries. Mary did not testify in the trial. No medically trained witnesses responsible

for treating her testified either. The photos appear to have been the most efficient means available for the State to demonstrate how Mary was injured in the assault. It took little time for the State to lay the predicate required for admitting the photos, as it laid the predicate through just eight questions. And finally, Maqbool contested the appropriate length of his sentence.

It follows that the trial court did not abuse its discretion in finding the photos more probative than prejudicial to the facts of consequence that were at issue in the trial. We overrule Maqbool's issues that complain about the trial court's admission of the photos.

## Conclusion

We overrule Maqbool's issues seeking to overturn the judgment the trial court signed in Trial Cause Numbers CR 12,525 and CR 12,526. For the reasons explained above, the judgments in these causes are

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on September 28, 2021
Opinion Delivered January 12, 2022
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.